NOT DESIGNATED FOR PUBLICATION

No. 117,714

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of
C.S., a minor child.

MEMORANDUM OPINION

Appeal from Franklin District Court; ERIC W. GODDERZ, judge. Opinion filed November 17, 2017. Affirmed.

*BreAnne Hendricks Poe*, of Finch, Covington, and Boyd, Chtd., of Ottawa, for appellant.

*Meredith D. Mazza*, assistant county attorney, and *Stephen Hunting*, county attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

*Per Curiam*: Prior to terminating the parental rights of a parent, the district court must find by clear and convincing evidence that the parent is unfit, the conduct or a condition which renders the parent unfit is unlikely to change in the foreseeable future, and the termination of parental rights is in the best interests of the child. K.S.A. 2016 Supp. 38-2269(a), (g)(1). The natural mother of C.S. (Mother) appeals the district court's termination of her parental rights. She argues the district court's decision is not supported by the evidence. Finding that it is, we affirm.

In November 2014, the State filed a petition alleging that C.S. was a child in need of care. C.S. was placed in the custody of the Kansas Department for Children and Families (DCF) in November 2014. C.S. was adjudicated as a child in need of care in March 2016. In June 2016, the State filed a motion to terminate Mother's parental rights,

1

and a hearing on the State's motion was held in November 2016. At the hearing the following evidence was presented.

Kelly Moore, a child protection specialist with DCF, testified that she had received a report in October 2014 alleging physical neglect, due to the deplorable condition of the home, of C.S., and another child. The children were temporarily placed with the maternal grandmother (Grandmother). Moore visited Grandmother's home and found that it was cluttered with trash, clothing, and various other items. Due to Grandmother's inability to care for the children and the state of Grandmother's home, C.S. was placed in police protective custody. Moore testified that she was unable to meet with Mother despite several attempts to contact her.

Amanda LaRue, a permanency supervisor for Kaw Valley Center (KVC), testified she was the supervisor and case manager for C.S. LaRue stated there was concern about Mother's ability to meet C.S.'s needs without the help of her other children. Mother relied heavily on the help of her older children to take care of C.S. A case plan meeting was held in December 2014, and Mother did not attend. The first case plan focused on cleaning up Mother's home and making it fit for C.S. to live in. LaRue testified the house was extremely dirty, trash blocked walkways, dirty dishes were common, and there was a significant fire risk. Mother was unable to complete this case plan task because the house burned down in December 2014.

Mother moved in with her boyfriend at the time. As part of her second case plan task stable housing was required, and home walk-throughs were necessary. Her boyfriend's home was physically appropriate but he had a criminal history which meant that C.S. could not live in the home while in DCF custody. Mother lived with her boyfriend for approximately eight months. She spent a week in a psychiatric hospital and then moved in with Grandmother. Moving in with Grandmother did not satisfy Mother's

case plan requirement. She had not obtained stable and appropriate housing of her own while LaRue was supervising.

Another task on Mother's case plan was to obtain stable income. At the onset of this case, Mother was employed as a LPN. However, Mother lost her job. LaRue indicated there was an investigation into her nursing license at some point. Mother later testified that the investigation was not why she lost her job. She had told Angela Lake, a counselor at KVC, the reason she had lost her job was because she was practicing while under the influence of narcotics. Mother was not employed for approximately one year.

Mother also needed to participate in mental health treatment. She was inconsistent with attending mental health treatment until June 2015, which occurred after her psychiatric hospitalization. Mother was consistent in treatment for a time but later started to miss appointments.

Mother was also required to submit to urinalysis testing. However, this was altered because Mother had a prescription for opiates. LaRue expressed concern that Mother was abusing her prescription. LaRue testified that Mother often appeared groggy and was late to appointments because she struggled to wake up due to her medication. Due to Mother missing appointments, a case plan task was added requiring her to arrive on time for all appointments, and if she was more than 15 minutes late the appointment would be cancelled.

Mother was able to have visitation with C.S. throughout the case, however the level of supervision fluctuated. She was originally allowed to have supervised visits with C.S., which later changed to unsupervised visits in the community. Due to Mother's poor decisions during the unsupervised visits, visits were changed to supervised office visits. During her supervised visits with C.S., Mother would not actively engage with C.S. Instead, she sat on the couch and encouraged C.S. to come to her. LaRue discussed

Mother's level of interaction with her monthly. LaRue did not see any significant improvement in interaction between Mother and C.S.

LaRue testified about Mother's inability to provide age appropriate care for C.S., given C.S.'s medical and developmental concerns. C.S. had a significant speech delay and Mother had not provided appropriate treatment. Further, C.S. had a heart condition which Mother had not responded to appropriately. Mother had not ensured that C.S.'s heart was being monitored effectively. Additionally, due C.S.'s heart condition, people were not supposed to smoke around C.S. or in areas where C.S. was located. Mother had continued to smoke around C.S.

When LaRue left KVC she recommended termination of parental rights due to Mother's lack of progress on her case plan tasks.

Angela Lake worked with Mother in an attempt to provide aftercare services. Lake testified Mother often cancelled parenting skills classes. Lake testified that while Mother was engaged when speaking with her, she lacked follow through to complete tasks on her own. Lake offered to help complete forms for various services, but Mother declined Lake's assistance.

Brittany Smith, counselor and case manager at the time of the hearing, testified that of the three case plan meetings between March 2016 and October 2016, Mother missed one and was late to another. In March 2016, Mother had moved in with her son T.J. The apartment was in T.J.'s name and T.J. paid the bills. After three weeks Mother moved back to Grandmother's home.

In June 2016, Mother moved into her own apartment. Smith provided her with a list of what needed to be completed for the walkthrough to be considered successful. Mother scheduled a walkthrough for early October. She subsequently cancelled the

4

walkthrough and rescheduled for mid-October. The walkthrough was completed in mid-October, but Mother had not completed all items required for a successful walkthrough. Mother was able to meet a majority of the conditions, but the house had not been fully childproofed. Mother testified the apartment was not ready for a walkthrough until October because she had been busy unpacking and working. Photographs from the walkthrough were entered into evidence and Mother agreed that items still remained on the floor.

Smith attempted to schedule a follow-up walkthrough in the week before the termination hearing to see if the remaining issues had been addressed. A walkthrough was scheduled but Mother cancelled it. Smith testified she would need to see at least three to six months of stable housing before reintegration could occur. Smith also testified that Mother continued to use prescription pain medication which was a cause for concern. The medication included multiple prescriptions from multiple doctors.

Mother exhibited improvement in attending meetings on time in the months preceding the termination hearing. She also improved her parenting style while visiting with C.S. Mother completed a number of continuing education classes to work on renewing her nursing license. However, she had not attempted to have her license reinstated, in part because she was concerned the investigation into her medication usage would resume.

Mother completed a parenting assessment in October 2016. Based on the assessment, Smith stated that Mother would need to follow the assessment recommendations for three to six months. If she was able to follow the recommendations for three to six months, a reintegration timeline could be developed. Smith stressed that reintegration would not occur within three to six months; instead a plan for reintegration could be considered at that point. Smith also testified that C.S. showed signs of hesitation

5

before visits with Mother. Smith testified that C.S. appeared to have a good time with Mother when they did meet.

At the close of the evidence the district court ruled that Mother was unfit and her unfitness was unlikely to change in the foreseeable future. Specifically the district court found reasonable efforts made by appropriate public or private agencies to rehabilitate the family had failed; there was lack of effort on Mother's part to adjust to her circumstances, conduct or conditions to meet the needs of C.S., and Mother had failed to carry out a reasonable plan toward integration of C.S. within a parental home. K.S.A. 2016 Supp. 38-2269(b)(3), (7); K.S.A. 2016 Supp. 38-2269(c)(3); The district court noted Mother had failed to comply with the case plan goals until the few months prior to the termination hearing.

On appeal, Mother does not argue the district court erred in finding her unfit. Instead, she argues the court did not properly consider her ability to change her conduct within the foreseeable future.

When determining whether a person's parental rights should be terminated, the district court must consider the nonexclusive factors set out in K.S.A. 2016 Supp. 38-2269(b). Any one factor may but does not necessarily establish grounds for termination of parental rights. K.S.A. Supp. 38-2269(f).

> "When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.* by clear and convincing evidence, that the parent's rights should be terminated." *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, we do not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

When determining whether a person will remain unfit for the foreseeable future the period of time to be considered must be from the child's perspective, not the parent's. See *In re S.D.*, 41 Kan. App. 2d 780, 790, 204 P.3d 1182 (2009). The court can consider a parent's past actions in determining future unfitness. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

Here, the district court ruled that Mother was unfit under K.S.A. 2016 Supp. 38-2269(b)(7) and (8) as well as K.S.A. 2016 Supp. 38-2269(c)(3). When examining the facts in a light most favorable to the State, it is clear the district court did not err in finding that Mother would remain unfit for the foreseeable future.

This case commenced in late 2014 when C.S. was 19 months old. Testimony was presented that Mother was slow to comply with her case plan, when she complied at all. She failed to make significant progress with her case plan goals until the few months prior to the termination hearing. Smith testified that Mother would need to follow recommendations for another three to six months before a reintegration timeline could be developed. Developing a timeline for reintegration is not the same as reintegration.

Mother relies on *In re M.B.*, 39 Kan. App. 2d 31, 176 P.3d 977 (2008), where the parental rights of the father were terminated because he would not be released from prison until seven months had passed. Here, Mother argues her reintegration plan could begin within as little as three months. Foreseeable future, however, is based on the unique circumstances of the case, and a projected timeline measured in months does not necessarily mean that it is within the foreseeable future. Here, Mother would need to comply with recommendations for three to six months to demonstrate sufficient stability

7

to then engage in a reintegration timeline of an unknown duration that would presumably result in reintegration. So any successful reintegration would have required an extended period, especially measured against C.S.'s age and the length of time he had already been in state custody.

C.S. was 19 months old when removed from Mother's custody. The termination hearing occurred nearly two years later. For 24 months C.S. was out of Mother's custody. She was given ample opportunity to achieve her case plan goals so that C.S. could come back to her home. Mother failed to make significant progress until the few months prior to the termination hearing. Even then, she was still unable to show that she had satisfactorily completed her case plan goals. The district court could properly consider Mother's past actions in determining whether Mother would remain unfit in the foreseeable future. See *In re Price*, 7 Kan. App. 2d at 483.

When viewed in a light most favorable to the State, the district court did not err in finding that Mother was unfit and would be unlikely to become fit in the foreseeable future when viewed from the child's perspective. See *In re C.C.*, 29 Kan. App. 2d 950, 954, 34 P.3d 462 (2001) (foreseeable future should be viewed from the child's perspective, not the parents').

Affirmed.